U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2012 APR 19  AM 9: 07

CLERK

BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

NORDIC WINDPOWER USA, INC.,       )
                                  )
        Plaintiff,                )
                                  )
    v.                            )        Case No. 5:12-cv-5
                                  )
JACKSONVILLE ENERGY PARK, LLC     )
and SOUTHPORT POWER, LLC,         )
                                  )
        Defendants.               )

**OPINION AND ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR
A PRELIMINARY INJUNCTION**
(Doc. 4)

This matter came before the court for an evidentiary hearing on March 20 and April 4, 2012 on the motion filed by Plaintiff Nordic Windpower USA, Inc. ("Nordic") seeking a preliminary injunction against Defendants Jacksonville Energy Park, LLC ("Jacksonville") and Southport Power, LLC ("Southport") (collectively, "Defendants"). Among other requests for relief, Nordic asks the court to enforce Nordic's rights to develop a wind project in Stamford, Vermont pursuant to the parties' agreements and enjoin Defendants from interfering with the same. (Doc. 4.) Defendants oppose the motion.

Nordic is represented by Matthew B. Byrne, Esq. and Andrew D. Manitsky, Esq. Defendants are represented by Heather Z. Cooper, Esq. and Rodney Edward McPhee, Esq.

I.      **FINDINGS OF FACT.**

For the purposes of the pending motion, based upon the admissible evidence, the court makes the following findings of fact:

**The Parties and the Stamford Site.**

1. Nordic is a Delaware corporation with its principal place of business in Kansas City, Missouri. Nordic is a technology developer and manufacturer of two-blade wind turbines suited for community wind and small wind farm developments. It does not advertise or market itself as a lender. It has never previously developed a wind power project.

2. Jacksonville is a limited liability company organized and existing under the laws of Vermont. Its sole member is Southport. Jacksonville's board of managers is comprised of Phillip Dickinson, the director of sales and marketing for Nordic, and Gabriel M. Selig, the sole member of Southport. All decision-making for Jacksonville requires the unanimous approval of both Mr. Dickinson and Mr. Selig.

3. Southport is a limited liability company organized and existing under the laws of Connecticut whose sole member is Mr. Selig. Mr. Selig is also the Chief Executive Officer and Manager of Southport.

4. Southport was formed in 2007 to develop and operate alternative energy projects, primarily wind and solar. It has been qualified under the Vermont Energy Act of 2009 to develop fourteen Standard Offer projects under the Vermont Sustainably Priced Energy Enterprise Development ("SPEED") program, including two wind projects and nine solar projects. Although Southport is currently developing a number of projects in Vermont, thus far none of these projects have received a Certificate of Public Good ("CPG") from the Vermont Public Service Board ("PSB") which is a condition precedent to the commencement of construction.

5. Jacksonville was formed for the purpose of developing a wind project on a 325 acre site located at 585 Sumner Road in Stamford, Vermont (the "Stamford Site"). It is Southport's intent to develop a solar project on this same site. David and Linda Orton own the Stamford Site. The Stamford Site has a unique topography.

6. On or about October 18, 2009, Southport entered into a land option agreement with the Ortons for the Stamford Site which was converted into a Purchase and Sale Agreement on November 9, 2009. The Purchase and Sale Agreement has been extended several times.

**The Wind Project and the Parties' Agreements.**

7. In 2010, Nordic and Defendants began discussing a possible business venture whereby they would co-develop a wind power project on the Stamford Site using Nordic's N-1000 wind turbines (the "wind project"). Nordic represented that the N-1000 had been interconnected with the power grid. This representation was truthful;

2

however, the N-1000 has only been connected to the grid in Indiana, Arizona, and Uruguay. In the event that it is successful, Nordic seeks to use the wind project on the Stamford Site to market its products and establish itself as a leader in the wind turbine field.

8. In furtherance of their discussions regarding co-development of the wind project, the parties entered into a Confidentiality Agreement on October 19, 2010 which was signed by both parties and provides that the parties "shall treat as confidential and safeguard all Confidential Information disclosed during the term of this Agreement in connection with the Proposed Activity."

9. On December 28, 2010, in furtherance of the wind project, the parties entered into four additional agreements: (1) the Co-Development Agreement (the "CODA"); (2) the Secured Promissory Note (the "Note"); (3) the LLC Pledge and Security Agreement (the "Pledge Agreement"); and (4) the Security Agreement.

**The CODA.**

10. The CODA is by and between Nordic and Jacksonville and governs the development of the wind project. It sets forth an initial budget and time line and requires the Board of Managers of Jacksonville to agree to a final budget and time line on or before March 15, 2011. Pursuant to the CODA, Nordic agreed to provide certain funds (the "Advances") for the wind project, and Jacksonville agreed to secure the funds necessary to complete the development and construction of the wind project. The Advances are due and payable under the Note, which is secured by the Pledge Agreement and the Security Agreement.

11. Under the terms of the CODA, Nordic has the power to determine in its "sole discretion" that a "Fatal Flaw" has occurred. The CODA defines a "Fatal Flaw" to include the failure to complete a development milestone "by more than one hundred twenty (120) days of the date that is set forth in the Time Line for such developmental milestones." Upon declaring a Fatal Flaw, Nordic may, among other things, "suspend the making of all further Advances."

12. Section 2.8 of the CODA requires Jacksonville to "repay the Note in full at the time that it is due." In the event of nonpayment, the CODA allows Nordic to, among other things, exercise its rights under the Security Agreement or the Pledge Agreement. This section of the CODA further provides:

> It is the intent of the Parties for Nordic to have the right, following the exercise of its remedies, to take exclusive control of the development of the Project (including the right to have another developer pursue the completion of the development of the Project)

and the process of selling Jacksonville, the Project or the assets of the Project.  In addition to all of its obligations under the Loan Documents, Jacksonville further agrees to cooperate in good faith with Nordic in connection with its efforts to sell Jacksonville, the Project or the assets of the Project.

13. The CODA contains a dispute resolution mechanism which requires Nordic and Jacksonville to meet in person through their designated representatives in the event they are unable to resolve a dispute within thirty days.  If the in-person meeting proves unsuccessful, Nordic and Jacksonville agree to have their dispute resolved by arbitration.  All parties have waived any right to arbitration and ask this court to adjudicate their disputes.

**The Note.**

14. The Note requires Jacksonville to repay any Advances made by Nordic:

> in full including accrued interest, fees, charges, costs and expenses as provided herein, if any, on the earliest to occur of: (i) one hundred twenty (120) days following the issuance of a written notice by [Nordic] that it has determined, in its sole discretion, that a fatal flaw exists as further provided in the CO-DA . . . and (v) December 31, 2011.

15. After an "Event of Default," which the Note defines to include the "failure to pay in full any payment of principal or interest hereunder within five (5) days of when due," all amounts become immediately due and owing.

**The Pledge Agreement.**

16. Pursuant to the Pledge Agreement, in the event of a Jacksonville default, Nordic acquires certain "step-in rights" which it now seeks to enforce by way of an injunction.  Section 2.7 of the Pledge Agreement provides:

> Upon the occurrence and during the continuation of any Event of Default . . . [Nordic] may (but shall not be obligated to) perform, or cause the performance of, any of [Southport's] obligations under this Agreement. [Nordic's] expenses, including the fees and expenses of its counsel, incurred in connection with performing any such obligations shall be payable by [Southport].

17. Also pursuant to the Pledge Agreement, in the event of a Jacksonville default, Nordic acquires certain "attorney-in-fact" rights which it now seeks to enforce.  Section 2.6 of the Pledge Agreement provides:

[Southport] hereby appoints [Nordic], or any officer or agent whom [Nordic] may designate, as its true and lawful attorney-in-fact and proxy, which appointment, being coupled with an interest, is irrevocable until the termination of [Southport's] obligations under this Agreement, with full power and authority in [Southport's] place and stead, and in [Southport's] name or in its own name, at [Southport's] reasonable cost and expense, from time to time after the occurrence and during the continuation of any Event of Default in [Nordic's] discretion to take any action and to execute any instrument that [Nordic] may deem necessary or advisable to enforce its rights under this Agreement or to accomplish the purposes of this Agreement or the other Loan Documents[.]

**The Security Agreement.**

18. Pursuant to the Security Agreement, Jacksonville pledged as security for the performance of its obligations, including those under the Note, among other things, the Vermont Speed Standard Offer Purchase Agreement dated January 4, 2010 between Jacksonville and VEPP Inc. (the "SPEED Agreement"); the Purchase and Sale Agreement with the Ortons; the Standard Application for Interconnection of Generation Resources in Parallel to the Electric System of Green Mountain Power ("GMP") (the "Interconnection Agreement"); all governmental approvals; all equipment, accounts, agreements, contract rights, inventory; and all proceeds, products, and accessories of and to any and all of the foregoing.

19. The Security Agreement states that, in the event of a default, Nordic is entitled "to take possession of, and foreclose upon" all of Jacksonville's rights in and to the wind power project "and any and all personal property of [Jacksonville], tangible and intangible, used or usable in connection therewith, and to enable [Nordic] . . . to operate, sell, lease, license or otherwise dispose of the entire interest of [Jacksonville] in and to the Project or any part thereof."

20. In the Security Agreement, Jacksonville agreed not to transfer or encumber any of the collateral, including the Purchase and Sale Agreement with the Ortons, or "take any other action, including without limitation, the delivery of documents and instruments, which may from time to time be requested by [Nordic] to effectuate the purposes of this Security Agreement."

**The Parties' Performance under the CODA and the Alleged Fatal Flaw.**

21. During the initial time line for the wind project, Nordic was untimely in making certain Advances under the CODA, and either Mr. Selig or Southport paid some of the amount due in Nordic's stead, including a payment to the Ortons to maintain site control.[1]  Mr. Selig did not declare a breach of the CODA on this basis, and he was ultimately reimbursed for the payments made by him that were not contested by Nordic.  The parties jointly failed to formalize a supplemental budget and time line under the CODA.  Each blames the other for this failure.  As the parties were awaiting the overdue results of a System Impact Study by GMP that would in large part determine the feasibility of the wind project, neither pressed the other for any significant progress.

22. Pursuant to the "Initial Time Line" in the CODA, the System Impact Study was to be completed by GMP by February 28, 2011.  As the parties concede, completion of the System Impact Study was in GMP's control[2] and was not materially delayed by either party.  GMP did not produce the System Impact Study by the February 28, 2011 deadline or within 120 days thereafter.

23. By letter dated August 18, 2011, Nordic notified Jacksonville of a "fatal flaw" under the CODA, citing the failure to meet the deadline for the System Impact Study by more than 120 days.  Nordic advised Jacksonville that it would suspend making any further Advances.  In its fatal flaw letter, Nordic did not cite that provision of the CODA which would allow it to declare the fatal flaw an "event of default."  *See* CODA, Section 5.1 (defining Jacksonville "Events of Default" as the failure "to perform in any material respect any of its obligations under this Agreement which failure is not excused hereunder and which continues for thirty (30) days after written notice from Nordic specifying (i) in reasonable detail the default complained of and (ii) that such notice is a notice of default pursuant to this Section 5.1[.]").

24. In August 18, 2011 fatal flaw letter, Nordic advised that it would accept the following remedy:

---

[1] Mr. Selig has made a number of other allegations in his affidavit including Nordic misrepresented its financial stability, told him it could not make timely payments, had ceased production of the N-1000, and had never connected the N-1000 to the grid.  Although Phillip Dickinson, Michael Kelly, and Thomas Wagner testified for Nordic, in cross-examination Defendants made no further effort to establish these allegations.  The court thus finds they have not been established.

[2] GMP needed to coordinate its efforts with National Grid as the Stamford Site is in close proximity to the Massachusetts border and is likely to impact that state's grid.

In order to remedy the above, Nordic requests Jacksonville to
<u>immediately</u> submit formal notification to the appropriate
authorities regarding Jacksonville's intent to request an extension
of the Power Purchase Agreement ["PPA"] to account for the
unforeseen delays in the System Impact Study.  Upon receiving the
final results of the System Impact Study, Jacksonville and Nordic
will re-evaluate the economics of the project accounting for the
interconnect costs.  If it is determined Jacksonville can
economically move forward with Nordic's N1000-77 wind turbine,
Jacksonville should then initiate the permitting process with a
formal request for the PPA extension as a condition to beginning
and incurring costs associated with such permitting process.

25. By letter dated September 29, 2011, Southport communicated with the PSB but did
not formally notify the PSB of its intent to seek an extension of the PPA.  In this
letter, Southport identifies a number of challenges with the wind and solar projects
and advises the PSB that, "[i]n short, the interconnection process has failed" and
"Southport will likely have to follow-up with the Board to request further assistance
with the interconnection for these Projects."  Southport did not send a copy of this
letter to Nordic, and the first time Nordic saw it was at the court's hearing.

**The System Impact Study and its Aftermath.**

26. In September 2011,[3] GMP completed the System Impact Study which concluded
"[t]he project was found to be feasible.  It will be allowed to interconnect with
certain modifications and additions to the local National Grid system as well as on
the customer's equipment."  The study forecasts the following costs associated with
the Interconnection Agreement: "[t]he estimated total cost to the Project for
necessary upgrades to the GMP and National Grid systems to connect the project is
estimated at $851,600."

27. The parties dispute whether GMP's System Impact Study was "favorable."
According to Mr. Selig, the study revealed an economically and technologically
viable wind project.  According to Nordic, the study revealed that because of wind
speeds and the anticipated costs of the Interconnection Agreement, the wind project
could not attract financing on its own merit.  As a result, Nordic proposed an
upgrade to the blades of the N-1000 wind turbines to improve lift and suggested the
parties may want to consider Nordic's next generation of wind turbines.  It also
expressed its concern that Jacksonville would be unable to attract the financing
needed for the wind project.

---

[3] In the letter to the PSB dated September 29, 2011, Mr. Selig stated he received the System
Impact Study "[t]wo weeks ago."

28. After the delay in GMP's System Impact Study, the parties understood that further delay could undermine or prevent the wind project's development as it would (1) preclude obtaining a federal grant for alternative energy projects which required completion of construction by December of 2012; (2) impede Jacksonville's ability to obtain a CPG prior to commencing construction with the understanding that the process of obtaining the CPG itself could take approximately six to nine months; and (3) render it difficult to satisfy the SPEED Agreement's requirement that the wind project be operational and producing power by January 4, 2013.

29. Soon after receiving the System Impact Study, Mr. Selig had contacts with several investors in an effort to secure additional financing for the wind project. Although Mr. Selig sought to reassure Nordic that he was in the process of obtaining financing, he did not have a firm commitment to announce. Power REIT was one of the parties with whom he was discussing financing at this point in time. However, Power REIT was only interested in the solar project. Power REIT and Southport entered into a Letter Agreement on November 22, 2011 to further discuss the solar project.

30. Through the fall and early winter of 2011, the parties continued to discuss the wind project although no firm progress was made. By email dated December 11, 2011, Nordic offered to discount the cost of its N-1000 turbines. It also proposed a revised budget and time line and suggested the parties create a joint bank account for Jacksonville wherein Nordic would initially deposit approximately $250,000 so that Jacksonville could begin paying for the remaining development. In response, also on December 11, 2011, Mr. Selig emailed Nordic and advised that he wished to be bought out of the wind project because the project was significantly more time, responsibility, and financial obligation than he had anticipated. The parties sought to meet but could not agree as to a location to do so. Mr. Selig initially requested that the meeting to take place in Rutland, Vermont, while Nordic requested that the meeting take place in New York City or, in the alternative, in a city which would allow for a direct flight for Mr. Dickinson. At this point, the parties' communications broke down and became increasingly acrimonious.

**Nordic's Contact with Power REIT.**

31. On or about December of 2011, Nordic's counsel in this action introduced Nordic to Power REIT.[4] Thereafter, Nordic and Power REIT entered into a Confidentiality, Non-Disclosure and Non-Circumvention Agreement whereby Nordic shared with Power REIT information that it had obtained from Jacksonville regarding the wind

---

[4] The court inquired regarding the likelihood that Nordic's counsel would be called as witnesses in this matter but thus far has not received a response.

project, and Power REIT shared information about the solar project that it had acquired from Southport.  Nordic claims that it shared this information inadvertently, believing Mr. Selig has already shared it with Power REIT.[5]

32. Mr. Selig asserts that Nordic interfered with his relationship with Power REIT, although he tacitly concedes that his own relationship with Power REIT had deteriorated.  Indeed, Power REIT has accused Mr. Selig of bad faith and has alleged that he was trying to sidestep their Letter Agreement by proposing deal terms that were materially different from the Letter Agreement, and by working with other parties.

33. In December of 2011, Nordic and Power REIT sought to meet with Mr. Selig to jointly formulate a plan to develop both the wind and solar projects on the Stamford Site.  Mr. Selig was unwilling to attend a meeting unless he could have his counsel present.  Ultimately, the parties did not meet.

34. During this time period, Mr. Selig claims Nordic and Power REIT allegedly threatened David Orton on the telephone in Mr. Selig's presence, urging him to no longer communicate with Mr. Selig or allow Mr. Selig to enter onto the Stamford Site.  Neither of the Ortons testified, and the court does not find this allegation has been established.

35. In a December 17, 2011 email, Mr. Selig stated that Mr. Kelly and Mr. Dickinson of Nordic had "worked very hard and used best efforts up to now to move the Jacksonville wind project forward."

36. On December 2, 2011, Jacksonville executed a purported assignment of the right to purchase the Stamford Site to Southport.  Mr. Selig acknowledges that he executed the assignment without the unanimous consent of Jacksonville's Board of Managers and without notice to Nordic.  He asserts that the Purchase and Sale Agreement with the Ortons had expired at the time of the purported assignment.

**The Notices of Default.**

37. By letter dated December 29, 2011, Mr. Selig issued a notice of default to Nordic wherein he made generalized allegations that Nordic had committed a series of breaches of the CODA and the Confidentiality Agreement without giving specifics as to details or dates.  Mr. Selig requested an immediate meeting between the parties to address these issues.

---

[5] The court does not find this claim credible in light of the undisputed fact that Mr. Selig's dealings with Power REIT only pertained to the solar project and thus he would have no reason or incentive to share information with regard to the wind project with Power REIT.

38. On December 29, 2011, Nordic sent Mr. Selig a notice of default under the Note, explaining that pursuant to the terms of the Note, payment of any outstanding debts became due and payable immediately as of December 16, 2011, and that the failure to pay such amount within five days thereafter constitutes an event of default.

39. As of December 29, 2011, the unpaid principal balance on the Note was $176,695. The principal amount due under the Note was provided to Mr. Selig at least once.

40. Nordic has also made a demand for interest of $56.99 per day and attorney's fees, for a total amount due of $234,574.21 as of February 16, 2012.

41. To date, Jacksonville has not paid any of the amounts under the Note, including amounts it acknowledges are due.

**The Wind Project's Anticipated Challenges.**

42. Nordic has taken steps to meet a safe harbor provision to secure Treasury Grant funding under Section 1603 of the American Recovery and Reinvestment Act of 2009 (the "ARRA"). The Treasury Grant program expired on December 31, 2011, subject to the safe harbor provisions, and this funding would equal thirty percent of the total project cost. To qualify for funding, the turbines must be commissioned by December 31, 2012.

43. Construction of the wind project will take approximately three to four months, depending on weather conditions.

44. Jacksonville has not yet entered into an Interconnection Agreement with GMP, which is required so that power produced by the wind project may be transmitted to the electric grid for delivery to GMP under the SPEED Agreement. Financing cannot be secured without the Interconnection Agreement in place.

## II.   PROCEDURAL BACKGROUND.

On January 11, 2012, Nordic filed its six count Complaint, seeking declaratory and injunctive relief and damages against Defendants. In Count One, Nordic alleges that Jacksonville breached the CODA by failing to complete the System Impact Study in compliance with the CODA's deadline. In Count Two, Nordic asserts that Jacksonville breached the Note by failing to make payments when due thereunder. In Count Three, Nordic alleges that Southport defaulted under the Pledge Agreement, entitling Nordic to

exercise its rights in the event of a default. In Count Four, Nordic contends that Jacksonville defaulted under the Security Agreement, entitling Nordic to exercise its rights thereunder. In Count Five, Nordic seeks a judicial sale pursuant to NY-UCC § 9-610 based on Jacksonville's default under the Security Agreement and Southport's default under the Pledge Agreement. Finally, in Count Six, Nordic seeks a deficiency judgment against Southport and/or Jacksonville if the sale of the LLC interests or the assets in it is less than the amount of the debt secured.

Defendants have answered and counterclaimed against Nordic, seeking compensatory and punitive damages and preliminary and permanent injunctive relief. In Count One of their Counterclaim they allege Nordic knowingly and willfully violated 8 V.S.A. § 2201 by extending a commercial loan without obtaining the proper license to do so. They ask that Nordic be precluded from collecting any amounts alleged to be due under the Note and for the court to declare the alleged violation a complete defense to Nordic's claims against them.

In Count Two, they allege Nordic committed fraud by intentionally or recklessly misrepresenting certain facts including facts regarding its financial stability, the capabilities of its turbines, and Nordic's intentions with regard to development of the Stamford Site.

In Count Three, Defendants allege Nordic breached the CODA by failing to make certain Advances, by failing to develop a supplemental budget and time line, by failing to engage in dispute resolution, and in making certain alleged misrepresentations. In Count Four, they allege that Nordic breached the Confidentiality, Non-Disclosure and Non-Circumvention Agreement through its interactions with the Ortons and others.

In Count Five, they allege negligence by Nordic in its role in the wind project's development. In a second Count Five, they allege the parties had a fiduciary relationship because Nordic was allegedly the controlling entity of the wind project, as well as its financial advisor and lender. They allege that Nordic breached that alleged fiduciary relationship, causing them damages.

In Count Six, Defendants allege a civil conspiracy between Nordic and Power REIT.  In Count Seven, they allege a breach of the covenant of good faith and fair dealing by Nordic.  Finally, in Count Eight, they allege Nordic tortiously interfered with Defendants' contractual relationships with the Ortons and unspecified utilities, vendors, equipment suppliers, and potential investors.

## III.   CONCLUSIONS OF LAW AND ANALYSIS.

In this case, federal jurisdiction is based on diversity of citizenship.  28 U.S.C. § 1332.  Accordingly, the court applies the substantive law of Vermont, the forum state. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005).

### A.  Standard of Review for Injunctive Relief.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  In *Winter*, the Supreme Court articulated the applicable standard for granting such relief:

> A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

*Id.* at 20 (citations omitted).

The Second Circuit requires a party seeking a preliminary injunction to show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979). Recently, the Second Circuit ruled that the "serious questions" standard remains viable after *Winter*. *See Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 38 (2d Cir. 2010).

"The 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs

outweigh the benefits of not granting the injunction." *Id.* at 35. "Because the moving party must not only show that there are 'serious questions' going to the merits, but must additionally establish that 'the balance of hardships tips *decidedly*' in its favor, its overall burden is no lighter[.]" *Id.* (internal citation omitted).

Where a party seeks an injunction that is mandatory in nature in that it "command[s] some positive act" as opposed to a "prohibitory injunction" that merely maintains the status quo, a more rigorous standard is applied. A mandatory preliminary injunction should issue "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Id.* at 35 n.4 (citations omitted).

Although in its motion for a preliminary injunction and in its proposed order Nordic requests broader injunctive relief, Nordic has since tailored its request to enforcement of Nordic's rights under the parties' agreements coupled with a prohibition on Defendants' interference with Nordic's exercise of those rights. This request may alternatively be characterized as either an enforcement of, or alteration in, the status quo. As the Second Circuit has noted, "[t]he distinction between mandatory and prohibitory injunctions is not without ambiguities or critics." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). "Determining whether the status quo is to be maintained or upset has led to distinctions that are 'more semantic[] than substantive.'" *Id.* (citation omitted); *see also Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 835 (1994) (noting that "in borderline cases injunctive provisions containing essentially the same command can be phrased either in mandatory or prohibitory terms.").

> The bottom line is that, if a preliminary injunction will make it difficult or impossible to render a meaningful remedy to a defendant who prevails on the merits at trial, then the plaintiff should have to meet the higher standard of substantial, or clear showing of, likelihood of success to obtain preliminary relief. Otherwise, there is no reason to impose a higher standard.

*Tom Doherty Assocs., Inc.*, 60 F.3d at 35.

Here, Defendants' remedies at trial will not be materially altered by Nordic's attempts to complete the wind project so that it may generate revenues. Moreover, Defendants cannot complain that Nordic's attempts in this respect are beyond the expectations of the parties as the parties' agreements clearly contemplate this possibility. There is also no evidence that Defendants will be deprived of a meaningful remedy if injunctive relief is issued and they nonetheless prevail at a trial on the merits. Nordic therefore should not be required to demonstrate a substantial or clear likelihood of success in establishing its entitlement to injunctive relief.

### B. Whether Nordic is Prohibited From Enforcing the Note.

Defendants argue that Nordic is foreclosed from seeking injunctive relief because any Advances it made were pursuant to a "commercial loan" as defined by 8 V.S.A. § 2200(2) for which Nordic has not obtained a license from Vermont's Commissioner of Banking, Insurance, Securities and Health Care Administration. Because Defendants characterize Nordic's noncompliance with this provision of Vermont law as "knowing and willful," they ask the court to find the Note void and deny Nordic the right to enforce the Note, as well as the related agreements.

Nordic counters that it is not in the business of making loans, and that a lending relationship was not the primary impetus for the Note. Rather, pursuant to the express terms of the Note, the loan was to facilitate the purchase of Nordic's N-1000 turbines and to make certain Advances under the CODA. *See* Note, Plaintiff's Exhibit 2 ("The obligation of the Holder to make advances to the Maker (or to pay development costs on behalf of the Maker) shall only be as is specified in the [CODA]."). It was Jacksonville's responsibility to secure long-term financing for the wind project from third parties. *See* Plaintiff's Exhibit 3 at § 2.2 ("Jacksonvillle shall be responsible for . . . securing the funds required to complete the development and construction of the Project[.]").

Vermont's Licensed Lender Act applies to persons in the "business of making loans[.]" 8 V.S.A. § 2201(a). Pursuant to 8 V.S.A. § 2201(a)(1), "[n]o person shall without first obtaining a license . . . from the commissioner engage in the business of making loans of money [or] credit[.]" An exception to this requirement applies to "a

seller of goods or services that finances the sale of such goods or services[.]" *Id.* at (d)(7).

8 V.S.A. § 2215(d)(1) provides for certain penalties for violations of the Licensed Lender Act and states:

> Any contract of loan made in knowing and willful violation of section 2201(a)(1) of this title, shall be void and the lender shall have no right to collect or receive any principal, interest, or charges whatsoever; provided, however, in the case of loans made in violation of section 2201(a)(1) of this title, where no finding of a knowing and willful violation is made, the lender shall have no right to collect or receive any interest or charges whatsoever, but shall have a right to collect and receive principal.

At least one Vermont trial court has held Vermont's Licensed Lender Act inapplicable to "a single, isolated transaction" entered into by an entity that was not "in the business of making loans." *Hawks Resorts Int'l, L.P. v. Coburn*, No. 90-2-10 Wrcv at 7-9 (Mar. 23, 2011); *See also Floyd v. Baton Rouge Sash & Door Co., Inc.*, 502 So.2d 1073, 1075 (La. 1987) (noting without deciding that "[w]hether the defendant can be said to have been in the *business* of making supervised loans on the basis of this single loan is problematic, at the very least."); *see generally Commonwealth v. White*, 157 N.E. 597, 597 (Mass. 1927) ("The phrase 'engaged in the business' means at least that the business shall be carried on as a regular occupation or constant employment as distinguished from a single isolated act."); *Parish v. Werner*, 1944 WL 2331, at *3 (Pa. Com. Pl. June 19, 1944) ("One transaction does not constitute a business.").

In this case, although it is undisputed that Nordic made Advances under the Note to Jacksonville, Nordic did so not in furtherance of a business of providing loans but to pursue the dual purpose of co-developing the Stamford Site and selling its N-1000 turbines. The provision of Advances under the Note was for a single, isolated loan which was part of a larger transaction that was motivated at least in part by Nordic's sale of N-1000 turbines. In such circumstances, Vermont law did not require Nordic to obtain a license so that it could loan money to Jacksonville.

### C. Whether Nordic is Entitled to Injunctive Relief.

#### 1. Irreparable Harm.

"The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959). A showing that irreparable harm is "actual and imminent" and "cannot be remedied by an award of money damages" is thus "the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999). Indeed, "a showing of irreparable harm is fundamental to any grant of injunctive relief." *Citigroup Global Mkts., Inc.*, 598 F.3d at 37 n.6. In the absence of irreparable harm, preliminary injunctive relief should be denied. *Id.*

Nordic argues it will suffer irreparable harm if the court does not grant a preliminary injunction because Defendants are "failing in their tasks, jeopardizing the entire project." (Doc. 4 at 11.) In support of this argument, Nordic notes that the SPEED Agreement, the Treasury Grant, and the CPG all impose deadlines that will be impossible to meet if Jacksonville rather than Nordic remains in control of the wind project. Nordic points out that Jacksonville's track record in this case belies any claim that it has the capability to complete the wind project as evidenced by its failure to obtain an Interconnection Agreement, its failure to secure construction funding, and the precarious state of its site control. Absent injunctive relief, Nordic argues that the wind project "will effectively be out of business." (Doc. 4 at 11.)

Nordic further argues that Defendants have all but abandoned the wind project which Mr. Selig has characterized as a poor return on his investment to date. *See* Plaintiff's Exhibit 23 ("The paperwork we signed over a year ago has not achieved a reasonable outcome[.] [T]his obligation has been <u>significantly</u> more responsibility, financial obligations and 4x time than contracted for."). Nordic notes that any claim by Defendants that they are ready, willing, and able to complete the wind project is belied by their representations to the PSB, the progress they have made to date, and their request that Nordic buy them out.

16

Finally, Nordic makes a decidedly less persuasive argument that it will suffer a loss of good will if injunctive relief is not granted because it will be unable to cite the wind project as evidence of its turbines' capabilities.[6]

As for whether it has an adequate remedy at law, Nordic argues that it has repeatedly attempted to obtain repayment of the Advances made under the Note to no avail. Moreover, it asserts that reimbursement of the Advances will only partially compensate it for its contributions to the wind project and will deprive it of its bargained for rights under the CODA, the Pledge Agreement, and the Security Agreement. Nordic further points out that the revenues to be generated from the wind project are exceedingly uncertain as they will be based upon wind speeds, interconnection costs, and market demands, thus making those revenues and the resulting profits, if any, inherently uncertain and difficult to calculate.

In response, Defendants argue that Nordic's contributions to the wind project have been exceedingly limited to date and are easily compensated by an award of money damages in a sum certain. They argue that Nordic has not shown irreparable harm because it has no ability to complete the wind project before certain deadlines and has no expertise in the field. Finally, they contend that Nordic seeks to exploit its wrongdoing and collusion with Power REIT to Defendants' disadvantage, and that injunctive relief should not be granted to reward such activities.

---

[6] Nordic does not point to any existing or even readily identified prospective business or customer relationships that will be lost or impaired if the wind project fails. Consequently, the evidence remains speculative as to whether there is a potential loss of good will. *See Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (opining that preliminary relief cannot be founded on "remote or speculative" harms); *Shapiro v. Cadman*, 51 F.3d 328, 332 (2d Cir. 1995) ("[T]he movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent[.]") (quotation marks and citation omitted); *Matrix Grp. Ltd., Inc. v. Rawlings Sporting Goods Co., Inc.*, 378 F.3d 29, 34 (1st Cir. 2004) (concluding district court did not err in denying motion for preliminary injunction based on lack of irreparable injury where marketer's claim of injury to its good will was too speculative and unsubstantiated); *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984) (finding no irreparable injury where the plaintiff's allegations that it would lose good will and "untold" customers were speculative).

Courts analyzing whether a party has satisfied the exacting standard of "irreparable harm"

> must not adopt a "categorical" or "general" rule or presume that the plaintiff will suffer irreparable harm . . . [but i]nstead the court must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the "remedies available at law, such as monetary damages, are inadequate to compensate for that injury."

*Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 393-94 (2006)).

In deciding whether Nordic has satisfied its burden to demonstrate irreparable harm, the court first addresses Defendants' argument that any irreparable harm is inextricably intertwined with Nordic's own misdeeds. While that may be true in some cases, here, it is not. Nordic's rights in this case arise from the parties' agreements. Although the issue of unclean hands must be examined before any injunctive relief may issue, the court is able to determine whether Nordic has shown irreparable harm independent of an examination of Nordic's motives and alleged wrongdoing.

In the absence of injunctive relief, Nordic will lose the benefit of the parties' agreements which clearly provide for the relief Nordic now seeks. In turn, if injunctive relief is denied, and Nordic prevails at trial, those lost opportunities will not be easily reduced to monetary damages. To the contrary, any damages awarded would require the finder of fact to engage in more than mere speculation, it would require it to predict the wind, the market, and the success of the project. Irreparable harm may be found where damages are difficult to quantify. *See Tom Doherty Assocs., Inc.*, 60 F.3d at 38 (stating "irreparable harm" may be found where a loss "will be very difficult to quantify at trial.").

Irreparable harm may further be found with Mr. Selig's efforts to remove collateral, in the form of the Purchase and Sale Agreement, from Nordic's reach. "It is familiar law that where a non-movant's assets may be dissipated before final relief can be granted, or where the non-movant threatens to remove its assets from the court's

18

jurisdiction, such that an award of monetary relief would be meaningless, injunctive relief is proper." *Firemen's Ins. Co. of Newark, N.J. v. Keating*, 753 F. Supp. 1146, 1153 (S.D.N.Y. 1990); *see also S.E.C. v. Am Bd. of Trade, Inc.*, 830 F.2d 431, 439 (2d Cir. 1987) (affirming grant of preliminary injunction in part because "there was a clear danger that the [defendants] would have depleted their assets substantially in the absence of a freeze."); *In re Feit & Drexler, Inc.*, 760 F.2d 406, 416 (2d Cir. 1985) ("even where the ultimate relief sought is money damages, federal courts have found preliminary injunctions appropriate where it has been shown that the defendant intended to frustrate any judgment on the merits by transferring its assets out of the jurisdiction.") (internal quotation marks and alterations omitted).

Having found irreparable harm, the court examines whether Nordic has established either a likelihood of success on the merits or serious questions for litigation with a balance of hardships decidedly in its favor.

### 2. Likelihood of Success on the Merits.

Nordic asserts it is likely to succeed on the merits based on the unambiguous terms of the CODA, Note, Pledge Agreement, and Security Agreement. As Nordic points out, Defendants do not dispute the fact that Nordic made Advances to Jacksonville under the Note which Jacksonville has not repaid. The Defendants also do not dispute that GMP's System Impact Study was untimely under the CODA. Nordic asks the court to enforce the unambiguous terms of the parties' agreements by granting the requested injunctive relief.

In response, Defendants assert a number of defenses including a primary defense that Nordic is not entitled to enforce the Note due to an alleged violation of Vermont's Licensed Lender Act--a claim which the court has already rejected. In the absence of this argument, Defendants do not otherwise claim the parties' agreements are unenforceable,[7]

---

[7] The fact that Defendants may now regret some of the terms of the agreements which appear to favor Nordic is not a basis for refusing their enforcement. *See Ellefson v. Megadeath, Inc.*, 2005 WL 82022, at *3 (S.D.N.Y. Jan. 13, 2005) (stating "once the offer has been accepted, the parties have formed a contract and are bound by the terms of that agreement, even if later events make them regret their decisions."); *Mavel v. Scan-Optics, Inc.*, 509 F. Supp. 2d 183, 186 (D. Conn.

although they do assert the court should refuse to enforce them based on Nordic's unclean hands.

Defendants further claim that Nordic has waived any fatal flaw, because "[i]t is undisputed that the parties continued to speak after the issuance of the fatal flaw letter and that the System Impact Study, which was not under the control of the Defendants, was issued shortly thereafter" and because "[o]n December 11, 2011, Nordic, by and through Phillip Dickinson, proposed to fund the remaining $250,000 under the Note[.]" (Doc. 35 at 3-4.)

Although the court raised the issue of waiver and cure with the parties at the conclusion of the first day of its evidentiary hearing,[8] and permitted supplemental briefing, Defendants addressed the issue of waiver or cure only briefly and Nordic did not do so at all.

"[W]hether nonperformance under a contract has been excused due to the conduct of the other party to the contract is a matter of affirmative excuse or justification, which the party so claiming has the burden of demonstrating."  13 WILLISTON ON CONTRACTS § 39:1 (4th ed. 2011).  The requisite proof is substantial:

> Because waiver of a contract right must be proved to be intentional, the defense of waiver requires a "clear manifestation of an intent by plaintiff to relinquish her known right" and "mere silence, oversight or thoughtlessness in failing to object" to a breach of the contract will not support a finding of waiver.

*Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 585 (2d Cir. 2006).  Defendants thus have the burden of establishing that their alleged defaults under the parties' agreements have been waived or cured.

---

2007) (granting an attachment despite the fact that "defendants may regret the contract's scope or, in retrospect, believe that the benefits it confers on the plaintiff are undeservedly generous").

[8]  "I've told you some of the things that I am thinking about in this case.  And it's my practice to tell you some of the things that come to me so that you can show me that I'm wrong.  But one is I was thinking about to what extent is there an argument that the fatal flaw was waived or cured. That came up today.  It hasn't been briefed by the parties."  See Docket 5:12-CV-5 March 20, 2012 (Tr. at 198).

Under Vermont law, a court must enforce a plain and unambiguous contract in accordance with its terms. *See Southwick v. City of Rutland*, 2011 VT 105, ¶ 5, 30 A.3d 1298, 1300 ("When the plain language of the writing is unambiguous, [the courts] take the words to represent the parties' intent, and the plain meaning of the language governs [the courts'] interpretation.") (internal citation omitted). Here, there is no claim that the terms of the parties' agreements are ambiguous, vague, or unconscionable. There is also no evidence that they are the product of fraud,[9] coercion, or duress. Accordingly, the only viable defense to their enforcement is that there has been no default thereunder, or that any default has been waived or cured.

Nordic has identified four events of default. The first is Jacksonville's failure to have the System Impact Study completed by February 28, 2011 or within 120 days thereafter. The second default is tied to the first default and is Jacksonville's failure to pay the Note within 120 days of the declaration of a Fatal Flaw. As a third default, Nordic cites Jacksonville's failure to pay the Note in full by December 31, 2011 and when demanded thereafter. Finally, Nordic claims an event of default in Jacksonville's conveyance of the Purchase and Sale Agreement to Southport. The court addresses each of these defaults below.

The completion of the System Impact Study was largely outside Jacksonville's control, and the CODA assigns responsibility for it to GMP. The CODA's definition of a "Fatal Flaw," however, nonetheless includes the failure to complete the System Impact Study by the designated deadline or within 120 days thereafter, regardless of whether any party is at fault. On August 18, 2011, Nordic issued a letter to Mr. Selig, notifying him of this Fatal Flaw, although it failed to cite the section of the CODA that would identify the Fatal Flaw as an "Event of Default" but instead relied solely on Section 2.3 of the

---

[9] Although Defendants assert a counterclaim of fraud against Nordic, they proffered no evidence that the parties' agreements were the product of that fraud. Their claim thus remains a mere allegation.

CODA which allowed it to cease making Advances. The CODA provides Jacksonville with thirty days to cure a Fatal Flaw that has been identified as an "Event of Default."[10]

The System Impact Study was issued in September 2011, although no party has provided a precise date of its receipt. A letter from Southport to the PSB dated September 29, 2011 states "[t]wo weeks ago, Southport received a favorable System Impact Study ("SIS") for this project." (Defendants' Exhibit R.) It thus appears that a cure of the alleged Fatal Flaw occurred within the CODA's thirty day window. This conclusion is buttressed by the parties' course of conduct which reflects a mutual belief and intention that the wind project would go forward after the declaration of the Fatal Flaw.

Nordic fares no better with its second "Event of Default" as it bases this default on Jacksonville's failure to pay the amount due under the Note within 120 days of the declaration of a Fatal Flaw. *See* Plaintiff's Exhibit 2 at ¶ 3(i) ("This Note shall be paid in full . . . on the earliest to occur of (1) one hundred twenty (120) days following the issuance of a written notice by the Holder that it has determined, in its sole discretion, that a fatal flaw exists as further provided in the CODA[.]"). As the alleged Fatal Flaw was timely cured, no default under the Note can be based upon the 120 day deadline.

For its third alleged default, Nordic relies upon the Note's unambiguous and unconditional provision requiring payment in full no later than December 31, 2011. *See* Plaintiff's Exhibit 2 at ¶ 3(v) ("This Note shall be paid in full . . . on the earliest to occur of (v) December 31, 2011."). It is undisputed that Jacksonville did not pay any portion of the amounts due under the Note by December 31, 2011 or thereafter. Nordic has notified Jacksonville of this default and it has failed to cure it. Defendants do not claim otherwise. The Defendants also do not claim that after December 31, 2011, the parties were still talking and Nordic remained willing to work with them to complete the wind

---

[10] Section 5.1(a) of the CODA defines Jacksonville's "Events of Default" to include Jacksonville's failure "to perform in any material respect any of its obligations under this Agreement which failure is not excused hereunder and which continues for thirty (30) days after written notice from Nordic specifying (i) in reasonable detail the default complained of and (ii) that such notice is a notice of default pursuant to this Section 5.1[.]"

project. Accordingly, the Defendants have established neither a waiver nor cure of this default. Nordic has thus established that it is likely to prevail on the merits in establishing this default.[11]

In addition to establishing a likelihood that it will succeed in establishing a default under the parties' agreements, Nordic has further established that those agreements allow it to invoke the rights it now seeks to have protected through injunctive relief. Section 2.8 of the CODA requires Jacksonville to "repay the Note in full at the time that it is due." (Plaintiff's Exhibit 3.) In the event of nonpayment, the CODA allows Nordic to, among other things, exercise its rights under the Security Agreement and the Pledge Agreement. This section of the CODA further provides:

> It is the intent of the Parties for Nordic to have the right, following the exercise of its remedies, to take exclusive control of the development of the Project (including the right to have another developer pursue the completion of the development of the Project) and the process of selling Jacksonville, the Project or the assets of the Project. In addition to all of its obligations under the Loan Documents, Jacksonville further agrees to cooperate in good faith with Nordic in connection with its efforts to sell Jacksonville, the Project or the assets of the Project.

(Plaintiff's Exhibit 3 at § 2.8.) The parties' agreements thus clearly contemplate that, in the event of a default, Nordic will have the right to complete or sell the wind project. These rights are no broader than the injunctive relief Nordic now seeks.

Based upon the foregoing, the court finds that Nordic has established a likelihood of success on the merits. It thus turns to whether injunctive relief should nonetheless be denied due to Nordic's unclean hands.

### D. Whether the Doctrine of Unclean Hands Bars Nordic's Requested Relief.

Defendants contend that Nordic should be barred from obtaining equitable relief by virtue of its unclean hands, as evidenced by a number of acts and omissions Nordic

---

[11] Because the court has found a likelihood of success on the merits based upon this event of default, it need not consider whether there is evidence of a second default based upon Jacksonville's unauthorized assignment of the Purchase and Sale Agreement to Southport.

allegedly committed in bad faith.  First, Defendants assert that Nordic determined the
wind power project could not yield its anticipated results, thereby making it undesirable
and incapable of stand-alone financing as early as July of 2011, yet failed to issue the
Fatal Flaw letter until August 18, 2011.  Second, Defendants argue that Nordic sought to
gain control of the solar project as well as the wind project, despite only having been
granted an interest in the wind project.  Third, Defendants state that Nordic shared
confidential information regarding Jacksonville with a third party, Power REIT, and
sought financing for interconnections for both the solar and wind projects, despite only
having the rights granted to it in the wind project.  Finally, Defendants contend that many
of the inherent delays upon which Nordic relies for its requested relief were caused by
Nordic, and that Nordic breached the CODA on which it now relies.[12]

Nordic counters that it has acted in good faith in order to save the wind project,
that it shared information with Power REIT only inadvertently (believing that Mr. Selig
had already shared the same information), and that Defendants' own unclean hands
preclude them from raising that affirmative defense.

"[H]e who comes into equity must come with clean hands . . . [which] is a self-
imposed ordinance that closes the doors of a court of equity to one tainted with
inequitableness or bad faith relative to the matter in which he seeks relief[.]"  *Precision
Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945).  While
Defendants' contentions have some merit, in order to invoke the defense of unclean
hands they must first demonstrate that they have themselves acted in good faith.  *Leo
Feist, Inc. v. Young*, 138 F.2d 972, 975 (7th Cir. 1943) ("[I]f the defendant has been
guilty of conduct more unconscionable and unworthy than that of the plaintiff, the rule
[of unclean hands] may be relaxed.").  Moreover, a claim of unclean hands "is not an
automatic or absolute bar to relief; it is only one of the factors the court must consider
when deciding whether to exercise its discretion and grant an injunction."  *Dunlop-*

---

[12] Defendants further claim that Nordic and Power REIT conspired to threaten the Ortons into
breaking off communications with Mr. Selig.  For purposes of this injunction hearing,
Defendants have not established this claim.

*McCullen v. Local 1-S*, 149 F.3d 85, 90 (2d Cir. 1998) (citing 11A WRIGHT, MILLER, KANE FEDERAL PRACTICE AND PROCEDURE § 2946 (2d ed. 2011)). As a result, a party who seeks to invoke the unclean hands doctrine has the burden of both establishing its applicability and establishing that it outweighs other considerations that favor equitable relief. Here, Defendants do neither.

Defendants have not established their own good faith. On more than one occasion, they offered to pay the amounts due under the Note and then failed to do so. A reasonable inference is that these offers were an effort to stall the exercise of Nordic's remedies rather than a good faith effort to cash Nordic out.

Defendants also sought to abandon development of the wind project. As Mr. Selig noted in his December 11, 2011 communication, he wished to be bought out of the wind project because it was significantly more time, responsibility, and financial obligation than he had anticipated. It is thus less than forthright to now claim that Defendants are aggressively pursuing the wind project's completion and should be allowed to continue to do so.

In addition, Defendants appear to bear a significant portion of the blame for the wind project's current precarious circumstances. Had they pursued their contractual obligations in a more diligent manner, the wind project's chances of success would be much greater.

More egregiously, Defendants alienated some of the collateral that secures their obligations under the parties' agreements without authorization or notice and presumably in bad faith. They proffer no reasonable explanation for removing this collateral from Nordic's reach. This, alone, constitutes sufficient unclean hands to preclude Defendants from raising the doctrine as an affirmative defense.

In any event, even with some evidence of unclean hands by Nordic, Defendants do not further establish that the proper consequence for such conduct would be to negate all of Nordic's contractual rights. In other words, this is not a case in which a party seeks equitable relief from the court beyond the relief to which the opposing party has already

contractually agreed.  The doctrine of unclean hands thus carries less weight here than it would in a case where equity provides the only path to the claimed relief.

### E.  Whether Injunctive Relief is in the Public Interest.

Nordic argues that it is in the public interest of the State of Vermont to promote the construction of alternative energy production, as established by the SPEED program, and that injunctive relief is in the public interest.  Defendants contend any argument about the public good is "premature . . . in light of the fact that [Nordic's] wind turbines to be used in the Stamford Site project are not capable to operate as specifically represented by [Nordic]."  (Doc. 9 at 14.)

"[W]henever a request for a preliminary injunction implicates public interests, a court should give some consideration to the balance of such interests[.]"  *DeBuono*, 175 F.3d at 233; *Jones v. Nat'l Conference of Bar Exam'rs*, 801 F. Supp. 2d 270, 290 (D. Vt. 2011).  The Vermont General Assembly has determined:

> it is in the interest of the people of the state to promote the state energy policy . . . by . . . [s]upporting development of renewable energy and related planned energy industries in Vermont, and the jobs and economic benefits associated with such development, while retaining and supporting existing renewable energy infrastructure.

30 V.S.A. § 8001(a)(2).

Based on the General Assembly's renewable energy goals as set forth in 30 V.S.A. § 8001, the court finds that successful completion of the wind project is in the public interest.

The court's finding of a public interest in the wind project must be tempered by the realities of this case.  The public and the State of Vermont have no particular interest in the identity of the party who will complete the wind project beyond a desire that it be a party with the requisite expertise, diligence, and ability to accomplish its goals.  Nordic is in the business of selling wind turbines; it has never developed a wind project and has not demonstrated any special expertise in doing so.  In comparison, Mr. Selig has broader expertise in alternative energy projects, although he, too, has never brought one to completion in Vermont.  The court thus cannot find that Nordic is more competent to

complete the wind project than Defendants, although it does appear more willing to do so.

As a result, while recognizing a public interest in injunctive relief, the court is mindful that this is a commercial enterprise for both parties to advance their own business interests, and it is not a service undertaken solely to advance the public good. *See Mid-West Conveyor Co., Inc. v. Jervis B. Webb Co.*, 1994 WL 133008, at *3 (D. Kan. Mar. 21, 1994) ("We discern no public interest in intervening [to issue an injunction] in private business disputes[.]"). Moreover, although Vermont law recognizes a public policy interest in protecting a party's legitimate commercial expectations, *see Prince v. Entergy Nuclear Operations, Inc.*, 2011 WL 3363207, at *6 n.3 (D. Vt. Aug. 3, 2011), in this case, both parties have legitimate commercial expectations that will be affected by the issuance or denial of injunctive relief.

On balance, the court does not find a compelling public interest in the issuance of the proposed injunction. It does find, however, that the public interest favors completion of the wind project which will be advanced by the issuance of injunctive relief.

### F. The Scope of the Injunction.

Although it initially requested far broader injunctive relief which would have transformed its request, at least in part, into a mandatory injunction, Nordic now advises that it seeks only enforcement and noninterference with its contractual rights under the parties' agreements. Nordic's proposed Order (Doc. 33-1), however, is broader than mere enforcement and could conceivably be extended to the solar project in which Nordic has no enforceable interest.

Because injunctive relief is an extraordinary remedy, it must be no broader than necessary to avert the alleged irreparable harm. *Forschner Grp., Inc. v. Arrow Trading Co. Inc.*, 124 F.3d 402, 406 (2d Cir. 1997) (requiring the court "to grant relief no broader than necessary to cure the effects of the harm caused by the violation.") (internal quotation marks omitted). As a result, the court must narrowly tailor the relief to the harm to be redressed. *See Transamerica Rental Fin. Corp. v. Rental Experts*, 790 F. Supp. 378, 382 (D. Conn. 1992) ("In fashioning an injunction, the court should make the

relief as narrow as required to attain the desired result."). The court must also comply with Fed. R. Civ. P. 65's requirement that the injunction "describe in reasonable detail-- and not by referring to the complaint or other document--the act or acts restrained or required." For this reason, the court grants only the injunctive relief to which Nordic has established its entitlement under the parties' agreements.

### G. The Posting of Bond.

The parties introduced no evidence regarding the security which should be posted in conjunction with the issuance of injunctive relief. Nordic asks that any requirement of security be waived, but provides no reasons or authority for this request. Similarly, Defendants provide the court with no evidence regarding the damages they will likely suffer if injunctive relief is wrongfully issued.

Rule 65(c) of the Federal Rules of Civil Procedure states that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The phrase "in an amount that the court considers proper":

> indicates that the District Court is vested with wide discretion in the matter of security and it has been held proper for the court to require no bond where there has been no proof of likelihood of harm, or where the injunctive order was issued "to aid and preserve the court's jurisdiction over the subject matter involved."

*Ferguson v. Tabah*, 288 F.2d 665, 675 (2d Cir. 1961) (citations omitted); *see also Clarkson Co., Ltd. v. Shaheen*, 544 F.2d 624, 632 (2d Cir. 1976) ("[B]ecause, under Fed. R. Civ. P. 65[c], the amount of any bond to be given upon the issuance of a preliminary injunction rests within the sound discretion of the trial court, the district court may dispense with the filing of a bond.") (citations omitted).

Although in his affidavit Mr. Selig asserts he has personally invested $450,000 in the project, it is not clear whether that amount pertains solely to the wind project, (which seems unlikely based upon the record before the court). Defendants have not requested any specific amount of security or bond although it asks that it be posted. In light of

Defendants' limited activities with regard to the wind project since their receipt of the System Impact Study, the court concludes that $75,000 is sufficient to protect Defendants' rights in the wind project in the event they are wrongfully enjoined. Although Defendants may ultimately claim more extensive damages in pursuing their counterclaims in this action, they have provided no evidence to the court which would allow the court to require such amounts to be posted as security.

## CONCLUSION

For the foregoing reasons, Nordic's motion for a preliminary injunction (Doc. 4) is hereby GRANTED IN PART. The court hereby ORDERS that:

**A.** Defendants, Jacksonville and Southport, are hereby ENJOINED from and must CEASE and DESIST from:

1. Interfering with Nordic's Attorney-In-Fact rights as set forth in Section 2.6 of the Pledge Agreement, which provides:

[Southport] hereby appoints [Nordic], or any officer or agent whom [Nordic] may designate, as its true and lawful attorney-in fact and proxy, which appointment, being coupled with an interest, is irrevocable until the termination of [Southport's] obligations under this Agreement, with full power and authority in [Southport's] place and stead, and in [Southport's] name or in its own name, at [Southport's] reasonable cost and expense, from time to time after the occurrence and during the continuation of any Event of Default in [Nordic's] discretion to take any action and to execute any instrument that [Nordic] may deem necessary or advisable to enforce its rights under this Agreement or to accomplish the purposes of this Agreement or the other Loan Documents[.]

2. Interfering with Nordic's exercise of its step-in rights as set forth in Section 2.7 of the Pledge Agreement which provides:

Upon the occurrence and during the continuation of any Event of Default . . . [Nordic] may (but shall not be obligated to) perform, or cause the performance of, any of [Southport's] obligations under this Agreement. [Nordic's] expenses, including the fees and expenses of its counsel, incurred in connection with performing any such obligations shall be payable by [Southport].

    **3.**  Interfering with Nordic's "possession of, and foreclosure upon, all of the right, title and interest of [Jacksonville] in and to the [wind] Project as set forth in the Security Agreement."

  **B.**  Nordic shall be entitled to exercise its right to develop the wind project as set forth in Section 2.8.2 of the CODA[13] and as set forth in paragraphs A.1 & 2 above.

  **C.**  Within fourteen (14) days of this Order, Nordic shall post security or bond in the amount of $75,000 in order to pay the costs and damages sustained by any party found to be wrongfully enjoined.

SO ORDERED.

    Dated at Rutland, in the District of Vermont, this _18th_ day of April, 2012.

                     Christina Reiss, Chief Judge
                     United States District Court

---

[13] It is the intent of the Parties for Nordic to have the right, following the exercise of its remedies, to take exclusive control of the development of the Project (including the right to have another developer pursue the completion of the development of the Project) and the process of selling Jacksonville, the Project or the assets of the Project. In addition to all of its obligations under the Loan Documents, Jacksonville further agrees to cooperate in good faith with Nordic in connection with its efforts to sell Jacksonville, the Project or the assets of the Project.